Exhibit-E
Part-1,2,3

# SOCIAL SECURITY ADMINISTRATION

Refer To: 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

*Exhibit-E*

Office of Hearings and Appeals
Atlanta Federal Center
60 Forsyth Street S.W.
Suite 2 M 15
Atlanta, GA 30303

Date: AUG 1 0 2005

Jimmy T. Stringer
241 Troy Street  Apt 13
Atlanta, GA 30314

## NOTICE OF DECISION – FULLY FAVORABLE

I have made the enclosed decision in your case.  Please read this notice and the decision
carefully.

### This Decision is Fully Favorable To You

Another office will process the decision and send you a letter about your benefits.  Your local
Social Security office or another may first ask you for more information.  If you do not hear
anything for 60 days, contact your local office.

### The Appeals Council May Review The Decision On Its Own

The Appeals Council may decide to review my decision even though you do not ask it to do
so.  To do that, the Council must mail you a notice about its review within 60 days from the
date shown above.  Review at the Council's own motion could make the decision less
favorable or unfavorable to you.

### If You Disagree With The Decision

If you believe my decision is not fully favorable to you, or if you disagree with it for any
reason, you may file an appeal with the Appeals Council.

### How to File an Appeal

To file an appeal you or your representative must request that the Appeals Council review the
decision.  You must make the request in writing.  You may use our Request for Review form,
HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office.  You may
also mail your request right to the **Appeals Council, Office of Hearings and Appeals,
5107 Leesburg Pike, Falls Church, VA 22041-3255**.  Please put the Social Security number
shown above on any appeal you file.

See Next Page

SOCIAL SECURITY
1111 JACKSON ST
OAKLAND CA 94607

Exhibit - E

Social Security Administration
**Supplemental Security Income**
Notice of Planned Action
Date: November 25, 2007
Claim Number: 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 DI

000025929 01 AT    0.334    B006,M1E,099
953 07S1746F42109



JIMMIE TINNIL STRINGER
PO BOX 1421
OAKLAND CA 94604-1421
I１ｌｌｕｄｕｌｄｌｌｕｌｌｕｕｌｕｌｕｄｌｄｌｄｌｄｌｄｌｌｕｄｌｄｌｄｌｌｌｄｌ



We are writing to tell you about changes in your Supplemental Security
Income (SSI) payments. The rest of this letter will tell you more about this
change.

We explain how we figured the monthly payment amounts shown below on the
last page(s) of this letter. The explanation shows how your income, other than
any SSI payments, affects your SSI payment. It also shows how we decided
how much of your income affects your payment amount. We include
explanations only for months where payment amounts change.

### Information About Your SSI Payments

- The amount due you beginning January 2008 will be $264.00. This
  amount includes $264.00 from the State of California.

- Even though the law provides for an increase in Supplemental Security
  Income payments beginning January 2008 your payment will be lowered.
  This is because there will be an increase in the amount of Social
  Security benefits in January 2008 which we must count in figuring your
  Supplemental Security Income payment.

### Your Payment Is Based On These Facts

Our records show your total monthly income which was used to figure your
Supplemental Security Income payment for January 2008 is $710.00. This is
based on the following income:

   Your increased Social Security benefits--before any deductions for
   Medicare premiums-- of $710.00. You should receive the increased
   Social Security benefit about January 3, 2008. We must count the
   increase in your benefits for January 2008 even though we are counting
   your other income for November 2007.

See Next Page

SSA-L8155

DEPARTMENT OF REHABILITATION
**AUTHORIZATION FOR SERVICES**

DR 297B  (Rev. 07/03) Computer Generated

No substitutions allowed without prior approval.

**DUPLICATE**

Authorization void after 60 days.

DGS REGISTRATION NUMBER:

TO: VENDOR, NAME AND ADDRESS

    CENTER FOR CAREER EVALUATIONS
    1330 BROADWAY STE 936
    OAKLAND+/, CA    94612

| CLIENT NAME (LAST, FIRST) | COUNSELOR NAME |
|---|---|
| STRINGER, JIMMIE T. | RWEIMER |
| DATES OF SERVICE | DATE |
| 02/20/2007 TO 02/22/2007 | 01/31/2007 |

**IMPORTANT NOTICE TO VENDORS**

The services listed below are authorized at a cost not to exceed the amount shown. If additional services are indicated, obtain further authorization before providing them.

*See Page 2 for Billing Instructions, Notification of the Information Practices Act of 1977 and Statement of Nondiscrimination.*

| DESCRIPTION OF SERVICES | AMOUNT AUTHORIZED | AMOUNT BILLED | UNLIQUIDATED BALANCE |
|---|---|---|---|
| SED 004 -- 3-DAY FUNCTIONAL EVALUATION<br>*** CASENOTE #019 ***<br>02/20/2007 TO 02/22/2007 1 EA @ 650.00 | 650.00 | | |

ENCLOSURES:

PLEASE POST your Federal Tax ID or Social Security Number on all invoices.
SEND INVOICE TO:

    DEPARTMENT OF REHABILITATION
    OAKLAND BRANCH
    1515 CLAY ST., STE. 119
    OAKLAND, CA    94612

*CERTIFICATION AND APPROVAL*

*I HEREBY CERTIFY, On my own personal knowledge that this authorization for the purchase of items specified above is issued in accordance with the procedure prescribed by law governing the purchase of such items for the State of California; that all such legal requirements have been fully complied with.*

| AUTHORIZED SIGNATURE | TITLE | | TELEPHONE NUMBER |
|---|---|---|---|
| *Rosemary Weiner* | SENIOR VOC REHAB COUNS, QRP | | (510) 622-2780 |

AGENCY USE ONLY    Document No. **7BF-170-2233**

| DISTRICT | STATUS | CASELOAD | SSN | ACCOUNT CODE | AMOUNT | CASE SERVICE CODE | DATE OF SERVICE MO  YR | FISCAL YEAR | CONTRACT/ SPECIAL PROGRAM |
|---|---|---|---|---|---|---|---|---|---|
| 210 | 18 | F07 | 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 | 030 | 650.00 | 3-14 | 02   2007 | 2006-2007 | |
| | | | | | | | | | |
| | | | | | | | | | |

DISTRIBUTION:    Copy 1 - Vendor    Copy 2 - Unpaid/Paid File    Copy 3 - Invoice Coding

CTAMEZ    Page 1    of 2

# CENTER FOR CAREER EVALUATIONS, INC.

March 15, 2007

**DEPARTMENT OF REHABILITATION**
**OAKLAND BRANCH**
**ATTN: Rosemary Weimer**
**1515 Clay Street, Suite 119**
**Oakland, CA  94612**

> **RE:** **Jimmie Stringer**
> **SSN #:** **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**

Dear Ms. Weimer:

Mr. Jimmie Stringer was referred to the Center for Career Evaluations for a three day Work Tolerance Screening. The Functional Capacity Evaluation portion of this assessment was conducted on **2/20/07.**

If you have any questions, please call for clarification.

Sincerely,

Lok Chan, O.T.R.
Work Capacity Specialist

## CASE BACKGROUND

Mr. Jimmy Stringer is a 36-year-old right-handed male who was referred to the Center for Career Evaluations to participate in a Functional Capacity Evaluation on February 20, 2007 from 1:00pm to 3:00pm. The purpose of this evaluation was to obtain current measured and observed physical tolerances.

## MEDICAL RECORD REVIEW

### Report of R Mahram, MD
### 11/2/04

33-year-old male with history of Charcot-Marie Tooth Disease . He presents with complaints of pain and other chronic neurological complaints.

## SUMMARY OF RESULTS

### Initial Screening Exam/Active Range of Motion

Active range of motion measurements are reported as percentages of normal. The term WNL is defined as Within Normal Limits.

#### Cervical Spine Active Range of Motion:

Active range of motion in the cervical spine was WNL throughout all movements. He reported increased aching in his neck with flexion and extension.

#### Lumbar Spine Active Range of Motion:

Active range of motion in the lumbar spine was WNL throughout all movements.

#### Upper Extremity Active Range of Motion:

Active range of motion in both upper extremities was WNL throughout all movements.

#### Lower Extremity Active Range of Motion:

Active range of motion in both lower extremities was WNL throughout all movements. He was able to full kneel and squat without observed difficulty. He reported that he occasionally has difficulty kneeling and squatting due to pain and dizziness.

## Upper Extremity Function

### *Grip and Pinch Strength:*

According to the Jamar Dynamometer, setting #2, grip strength averaged 115 pounds on the right dominant hand and 118 pounds on the left, which are 96% and 105% of average for age and gender respectively. Lateral pinch averaged 25 pounds on the right and 24 pounds on the left, which are 96% and 94% of average for age and gender respectively. He reported increased cramping in both hands with gripping. He reported his pain as a "sudden shock" and was observed to have jerky movements when the pain occurred.

Coefficient of variation ratings for grip and pinch strength were in the acceptable range as a measure of consistent maximal effort.

## Forward and Overhead Reaching

Forward and overhead reaching combined with manipulating dials, toggles, and switches was performed for 12 minutes and 8 minutes respectively. He did not report any difficulty with forward reaching, however, overhead reaching resulted in increased burning and throbbing in his neck and right arm.

## Sitting, Standing, and Ambulation

### Sitting
Mr. Stringer was observed to sit continuously for 45 minutes before alternating to a standing position. The change in position was due to limit of opportunity rather than physical discomfort. He reported that he is normally able to sit for up to 1 hour at a time, however, some days when his pain is exacerbated, his sitting tolerance can be limited to 15 minutes.

### Standing
Mr. Stringer was observed to stand continuously for a maximum of 55 minutes before alternating to a seated position. The alternation was due to a limit of opportunity rather than physical discomfort. He reported that he is normally able to stand for up to 1 ½ hours.

### Ambulation
Mr. Stringer was able to ambulate for 10 minutes on a level, carpeted surface, for the equivalent of 40% of a mile. He ambulated without a limp and reported no physical discomfort.

## Lifting

### Static Lifting

According to the ERGOS Work Simulator, Panel 1, Mr. Stringer was able to statically push a maximum of 50 pounds and pull a maximum 46 pounds at cart height (42 inches). He was also able to statically lift 119 pounds at knuckle height (31 inches). He reported increased pain in his right hand with static pulling. Static lifting at knuckle height resulted in increased low back pain. He described the pain as "intense, sharp pain."

### Dynamic Lifting

#### Waist to Shoulder and 12" to Shoulder:

Mr. Stringer was able to lift a maximum of 30 pounds from waist to shoulder and 12" to shoulder level without reported difficulties. However, when attempting to lift 40 pounds from these levels, he demonstrated a breakdown in body mechanics and reported increased pain in his upper back.

Mr. Stringer is able to safely lift 30 pounds on an occasional basis and 10 pounds frequently from these levels.

#### 12" to Waist:

Mr. Stringer was able to lift a maximum of 40 pounds from 12" to waist levels without reported physical discomfort. When attempting to lift 50 pounds from this level, he demonstrated a breakdown in body mechanics and reported low back pain. He is able to safely lift 40 pounds from this level on an occasional basis and 20 pounds frequently.

#### Overhead:

Mr. Stringer was able to lift a maximum of 20 pounds to an overhead position without physical discomfort. When attempting to lift 30 pounds overhead, he reported increased neck and right arm pain.

## Carrying

Mr. Stringer was able to carry a maximum of 30 pounds bilaterally for 100 feet with reported pain in his right arm and neck. He also reported increased dizziness while carrying this weight. He was able to carry 20 pounds bilaterally for 100 feet without difficulty. Mr. Stringer was also able to carry a maximum of

3

20 pounds with his right and left hands for 50 feet each without reported physical discomfort.

## BEHAVIORAL OBSERVATIONS

Mr. Stringer arrived promptly to CCE for his scheduled appointment. He was cooperative during the entire FCE. He reported that he did not take any pain medications prior to arrival. Upon beginning the FCE, he was asked to provide subjective pain ratings on a scale of 0 to 10, with 0 signifying no discomfort at all, and 10 signifying severe discomfort requiring emergency room attention. Upon beginning the FCE, he reported experiencing 7 out of 10 pain mainly in his neck and both arms. He also reported having cramping in his right leg. During the evaluation, he experienced increased pain of up to 10 out of 10. He experiences sharp, intense pains which occur suddenly and unpredictably. When he has these pains, they last for brief periods of time and was observed to jerk his entire body. Upon completion of the FCE, he reported a pain level of 8 out of 10 in his neck and shoulders in addition to general fatigue.

Subjective complaints of pain were consistent with objective pain behaviors. He was observed to have "electrical shocks" which resulted in his body jerking. Mr. Stringer was motivated to complete the FCE and was observed to provide full physical effort with all test items.

## CONCLUSIONS

Based on the results of this FCE, Mr. Stringer currently meets the physical demand characteristics of Sedentary to Light work as defined by the Department of Labor. Light work requires exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Even though the weight lifted may be only a negligible amount, a job should be rated Light when it requires walking or standing to a significant degree.

Mr. Stringer demonstrated the ability to lift a maximum of 30 pounds from waist to shoulder and 12" to shoulder levels. He was also able to lift up to 40 pounds from 12" to waist level. He did not demonstrate any limitation with sitting and standing tolerances of 45 minutes and 55 minutes respectively during the FCE.

Mr. Stringer reported having increased neck pain with range of motion of his cervical spine. Overhead reaching resulted in increased neck and shoulder pain. He was able to fully kneel and squat without observed difficulty. Grip and pinch strengths were average for both hands.

At the present time, Mr. Stringer demonstrates the physical tolerances for Sedentary to Light level work. He continues to experience occasional sharp pains which can occur anywhere in his body at any time. It should be noted that

4

although he meets all of the physical demands of light work, Mr. Stringer may experience days in which his pain levels are increased to a level which he is unable to tolerate any type of activity. He may require occasional days off work when his pain symptoms are exacerbated to these levels.

He was observed to provide full physical effort on during the FCE as demonstrated by consistency on isometric testing and competitive performance testing behaviors on items completed.

**INITIAL INTERVIEW**

Prior to beginning the Functional Capacity Evaluation, an intake interview was conducted with Mr. Stringer. He reported the following information and current physical tolerances.

**Current Medical Treatment:** No current or pending medical treatments.

**Medication Use:** Takes medicinal cannibus as needed for pain. He was prescribed Percocet and Vicodin which he no longer takes.

**Activities That Increase Pain:** He reported that his pain is uncontrollable and unpredictable. Any movement or activity can cause pain at any time.

**Self Care Activities:** Fully Independent.

**Sleep:** Does not sleep well due to pain/discomfort.

**Household Activities:** Able to complete all tasks with increased time.

**Assistive Devices:** Occasionally uses a cane.

**Sitting:** Able to sit for a maximum of 1 hour.

**Standing:** Able to stand for up to a maximum of 1 hour.

**Walking:** Able to walk for up to 1 hour.

**Use of stairs:** Able to climb stairs with difficulty.

**Lifting/Carrying:** Able to lift up to 50 pounds. Unable to perform repetitive lifting.

**Driving:** No reported difficulty.

## SUPPORTING DATA

**AGE:** 36    **HEIGHT:** 6'0"    **WEIGHT:** 170 lbs.    **HAND DOMINANCE:** Right

## *Functional Capacity Testing*

| Functional Activity | Measured Tolerance | Reason for Stopping |
|---|---|---|
| Sitting | 45 minutes | Limit of opportunity |
| Standing (Dynamic) | 55 minutes | Limit of opportunity |
| Walking (10 minutes) | 40% of a mile | Completed activity |
| **Agility** | | |
| Stooping | Initial screening: 15 secs. | Completed activity |
| Kneeling | Initial screening: 15 secs. | Completed activity |
| Squatting | Initial screening: 15 secs. | Completed activity |
| **Reaching** | | |
| Forward:   Intermittent | 12 minutes | Completed activity |
| Overhead | 8 minutes | Completed activity Pain |
| **Dynamic Lifting** | | |
| Waist to Shoulder | 30 pounds | Maximum Tolerance |
| 12" to Waist | 40 pounds | Maximum Tolerance |
| 12" to Shoulder | 30 pounds | Maximum Tolerance |
| Overhead | 20 pounds | Maximum Tolerance |
| **Static Strength** | | |
| Push (42" height) | 50 pounds | Maximum Tolerance |
| Pull (42" height) | 46 pounds | Pain Maximum Tolerance |
| Lift Knuckle height (31") | 119 pounds | Pain Maximum Tolerance |
| **Carrying** | | |
| Bilateral Upper Extremities (100 feet) | 30 pounds | Pain Maximum Tolerance |
| Right Upper Extremity (50 feet) | 20 pounds | Maximum Tolerance |
| Left Upper Extremity (50 feet) | 20 pounds | Maximum Tolerance |

## *Hand/Finger Strength and Dexterity*

| Test | Measurement | Mean/Effort |
|---|---|---|
| Grip Strength – **Right** | Average: 115 lbs. | 96% of Mean |
| Coefficient of variation | CV: 5.1% | Effort: Maximal |
| Grip Strength – **Left** | Average: 118 lbs. | 105% of Mean |
| Coefficient of variation | CV: 10% | Effort: Maximal |
| **Pinch Strength** | | |
| Lateral – **Right** | Average: 25 lbs. | 96% of Mean |
| Coefficient of variation | CV: 3.7% | Effort: Maximal |
| Lateral – **Left** | Average: 24 lbs. | 94% of Mean |
| Coefficient of variation | CV: 2.0% | Effort: Maximal. |

# VOCATIONAL EVALUATION REPORT

## Initial Interview

Mr. Stringer informed he was diagnosed with Charcot-Marie-Tooth Disease, which is a neurological disease. Information provided by rehabilitation counselor, stated "this causes slow but steady nerve degeneration and prevents him from physical labor." He notes he has not been able to work since February or March of 2001 as a result of this medical condition. He indicated having good and bad days and notes he periodically has muscle tightening, including pain and this could occur in his neck, back, hands, legs, shoulders, or feet. He noted he has been in and out of hospitals due to periodically experiencing chronic pain and spasms in his neck. He added he experiences pain in his head and stated, "It is like a squeezing feeling in the head. I do get real stiff and I need to be moving." He was referring to the fact that if he stays in a fixed position for long periods, this occurs. To manage pain, he uses Cannabis. He added that at age of 13, he was paralyzed from the waist up and has always suffered from arthritis.

Mr. Stringer noted he obtained his GED and had dropped out of high school in the 10th grade. He is currently taking paralegal courses at Merritt College. Reportedly, he was last employed as a furniture delivery laborer and additional work included construction laborer and warehouse worker. He notes on the intake information sheet wanting to become "self-employed by operating a recreation facility." He notes interest in learning about legal issues, especially as it pertains to his situation. Furthermore, he noted he always enjoyed being very active and in good physical condition, but he now only does aerobics.

The purpose of the three day Work Tolerance Screening was to assess Mr. Stringer's academic and aptitude abilities, vocational interests, and objective physical tolerances.

## Evaluation Results and Conclusions

Mr. Stringer attended his three day vocational evaluation, as scheduled on February 20-22, 2007. He arrived punctually on all three days and was generally observed to be pleasant, social, and a cooperative individual. He exhibited the motivation to attempt tasks to the best of his abilities, although he consistently exhibited non-verbal pain behavior when he would periodically note he was experiencing sharp, intense shooting pain throughout various parts of his body and would grimace and jerk his entire body. At times, he would take deep breaths when experiencing milder sharp pain.

1

## VOCATIONAL EVALUATION REPORT

More work activity was performed in the seated position. He was able to remain seated for durations of 30-60 minutes on a consistent basis and periodically, he had opportunities to stand briefly, although he was not observed to stand for more than 5 minutes in between seated positions. Even when sitting and quietly performing tasks, he would periodically verbalize loudly when he was experiencing pain and was uncomfortable. From 85-93% of hours, he remained seated. He did stand up for 12 minutes to perform the manual dexterity, although this was not the clients choice, it was requested by the evaluator. He also was in agreement in performing brief range of motion activities that entailed picking up books and placing them from overhead to floor levels. These activities were not performed more than 11-14 minutes and following completion of these tasks, he did note experiencing irritation in his lower back, followed by noting it was an "electrical shock all over." For the most part, he would say that he is learning to deal with it. He was observed to be able to stoop and kneel to reach below the waist and floor level shelves. Upon performing repetitive reaching at waist level, he indicated he had some pain in his left abdominal area. All of the activities that involved intermittent marking or writing at a slow pace, and 10-key operations, were not indicated to cause particular discomfort. He did say that after he typed for 10 minutes he was feeling cramping in his hands.

Academic results were more consistent with that required for vocational schooling. Test results identified reading comprehension within the 11th grade, arithmetic computation within the 9th grade, and spelling within the 5th grade. These scores in conjunction with observed need to have multiple step instructions periodically repeated and low average score on the Oral Directions Test substantiate the aforementioned. He also ended with a below average score on the Nonverbal Reasoning Test, which measures general learning abilities. These results indicate he is able to read manuals, read non-technical information, perform basic math calculations, and complete forms and purchase orders. Based on his low score on grammar (language usage subtest), he is likely to have limitations with rote office correspondence.

Mr. Stringer was successfully able to complete clerical forms, as well as recordkeeping activities involving performing math computation with the use of a business machine and completing a payroll ledger and billing sheet. Although he has limited computer literacy, he successfully performed on a numeric computer data entry task. His typing was tested at 17 wpm with 99% accuracy. Some improvement would be needed in his numerical and alphabetic filing. He ended with a below average score on the Social Service Case Worker work sample. On this activity, he had to read case scenarios and make appropriate service decisions. With the aforementioned basic skills exhibited, Mr. Stringer shows potential to learn jobs, with the appropriate training, that involves inputting of basic information in a computer, such as name, address, and identification information, complete basic forms, and obtain information from customers on the phone or in person. These skills could be applied to jobs, such as lobby attendant/selective security guard, parking cashier, motel clerk (in a low key setting), self-storage facilities clerk, and surveillance camera monitor.

2

# VOCATIONAL EVALUATION REPORT

On the aptitude test, his strongest scores were in spatial relations, verbal reasoning, and this suggests he has the abilities to be able to perform quality inspection types of jobs and may learn to read basic schematics or blueprints. This would also be applicable to learning jobs involving computer drafting, although Mr. Stringer is computer illiterate and never has learned drafting skills. His overall profile on the aptitude battery did not identify any occupational categories to be of average potential for success. Some potential for success exists for jobs within the outdoor, consumer economics, skilled technology, and service categories. Ultimately, these categories were determined by his overall subtest scores.

According to the interest inventory (COPS), Mr. Stringer indicated interest in nearly all of the 14 occupational categories. He was asked to review jobs that might be of interest to him from selected interest areas, and the following were identified as being of particular interest: Criminalist, glass inspector, air craft mechanic, airplane pilot, helicopter pilot, inspector, and voltage tester. Additional jobs indicated to be of some interest included: Information scientist, solar fabrication technician, electronic skill tester, and food and beverage checker.

According to results of the three day Work Tolerance Screening, which included participating in work simulation, academic testing, as well as objective physical tolerances assessment, it seems Mr. Stringer will be relegated to pursue employment that is considered Sedentary to Light work categories. Mr. Stringer noted he is seeking to obtain part-time employment. This was corroborated by the evaluator, particularly in light of the physical discomfort he experiences, even when he is seated and performing light manipulatory activities. Mr. Stringer noted he needs to explore training or work options because he requires more income than SSDI offers, not only to maintain his standard of living, but also to be able to raise his two young daughters. Demonstrated aptitudes and academics are considered functional, although it is anticipated he may have problems understanding highly technical information and also perform higher level problem solving or independent judgment. It would be most effective for him to learn new job skills from on the job or vocational programs that place an emphasis on hands-on learning. He presented with basic aptitudes and skills and seems could perform job responsibilities that would allow him to interact with the public on an occasional basis and in a non-sophisticated work environment. He could basically learn to input information, such as basic data on a computer, complete forms or purchase orders, and provide information to the public. However, the client did not present nor reported he has the physical abilities to be able to consider full-time employment and jobs are going to be selective due to physical restrictions. What may be difficult for him is finding the means of being able to manage pain so that he does not end up startling individuals when he verbally expresses his pain. When he experiences the shocking pain he tends to jerk his entire body. It is not anticipated he is going to be able to perform jobs that require listening to rapid information or using his hands at a demanding pace. He will primarily need to perform from the seated position and if any reaching is required, he should do it at the middle range level of the body and minimize stooping, bending, and lower level reaching. He was able to do some range of motion, but because of the sudden problems with shocking pain and also becoming dizzy it is not suggested. Jobs

3

# VOCATIONAL EVALUATION REPORT

that were discussed as possible options include: Selective security guard, self-storage facilities clerk, information clerk, motel clerk, or apartment manager. These are jobs that would allow him to alternate to standing and walking periodically and would not require physical exertion. Mr. Stringer was pleasant and appropriately interacted with staff and co-workers and seemed to put forth the effort to perform to the best of his abilities.

# VOCATIONAL EVALUATION REPORT

**ATTENDANCE**

| 2/20/07 | 9:05 a.m. to 3:00 p.m. |
|---------|------------------------|
| 2/21/07 | 9:05 a.m. to 2:48 p.m. |
| 2/23/07 | 9:30 a.m. to 12:30 p.m. |
|         |                        |

# VOCATIONAL EVALUATION REPORT

## *APTITUDE AND ACHIEVEMENT TESTING*

### CAREER ABILITY PLACEMENT SURVEY (CAPS)

| Subject | %ILE | Subject | %ILE |
|---|---|---|---|
| Mechanical Reasoning | 11 | Language Usage | 8 |
| Spatial Relations | 50 | Word Knowledge | 50 |
| Verbal Reasoning | 50 | Perceptual Speed/Accuracy | 17 |
| Numerical Ability | 8 | Manual Speed/Dexterity | 17 |

| Subject | Result | Norms |
|---|---|---|
| Gates-McGinitie Reading Test, Level AR, Form R | 11.5 | Grade level equivalent |
| WRAT, Revised Level III – Math Test | 9.5 | Grade level equivalent |
| WRAT, Revised Level III – Spelling Test | 5.9 | Grade level equivalent |
| Personnel Test for Industry – Oral Directions | 28%ILE | Electronic assembly applicants |
| Nonverbal Reasoning Test | 18%ILE | Industrial group |
| SRA Office Skills – Forms Completion | 80%ILE | Clerical workers in government agencies of California |

## *WORK SAMPLE TESTING*
(Norms: General Adult Working Population)

| | *Time* | | | *Accuracy* | | |
|---|---|---|---|---|---|---|
| | AA | A | BA | AA | A | BA |
| Soc. Service Caseworker | | | | | | X |
| Bookshelving, Alpha | X | | | | | X |
| Bookshelving, Numerical | X | | | | | X |
| Record Keeping | | | X | | X | |
| Computer Data Entry | X | | | X | | |
| Typing | 15 wpm | 99% accuracy | | | | |

# North County Self Sufficiency Center

## APPLICANTS for CASH and/or Food Stamp ASSISTANCE

The next steps in the application process are:

1.  An orientation meeting.

2.  A General Assistance Group meeting (GA applicants only).

3.  An interview with your Eligibility Worker.

**Your worker will be assigned while you are in the orientation meeting or GA group meeting. Your worker may be scheduled more than one application from your group meeting.** You must be in the Intake/Waiting Area at the starting time circled above. You will be called or paged by name. If you do not respond to the call/page, the worker will not be able to conduct the Interview and this will delay processing your application. Your eligibility worker will then have to fit your interview into his or her schedule at a later time.

If you need to make copies, you can use the copier in the Resource Room or the copier in the Interview area. Be sure to return to the Waiting Area before your interview starting time.

You must be fingerprinted and have your photo taken before your application can be approved. You may be able to do this before your orientation meeting or, for GA, between the orientation meeting and the GA group meeting.

Name: _Jimmie Strange_ Case # _4016723_

❑ **CalWORKS, Food Stamps, and GA Applicants**

Orientation meeting time: _____ @ _____
                            Date                    Time

❑ **General Assistance (GA) Applicants**

Orientation meeting time: _____ @ _____
                            Date                    Time

**Please be on time** for your appointment. *If you need to reschedule for the **GA Group Meeting** please contact us.*

_Emergency Food Stamp_
_1/22/08 @ 9:00_

_208937_

*John J. Mallet, PH.D.*
*Atlant.Ga*
-8-
*404-254-1602*

Stringer, Jimmy

During the afternoon part of the examination, he showed a lot fewer "shocks," his medicine seems to have kicked in. But then he would get a shock, he is angry that he is ill.

His illnesses are always with him, and there is probably a fear of death.

Summary and Recommendations: Diagnostic impressions are (DSM-IV):

I.   1.   Cognitive Disorder NOS, Slight, 294.9, partly from the distractions of his "shocks" and partly from his overall neurological conditions. Verbal IQ 89, Performance IQ 97, Full Scale IQ 91, General Memory 93, Working Memory 91.

     2.   Depressive Disorder NOS, 311, moderate, and perhaps moderately severe at times.

II.  1.   No personality disorder stood out. He is preoccupied by his neurological conditions and fears the consequences of his conditions.

III. 1.   According to medical records, Charcot-Marie-Tooth disorder; chronic pain.

This claimant is frequently visited by stabbing pains which would appear to be too distracting to let him function in a work situation. Additionally, he is depressed over his life situation.

He appears to need continued neurological treatment and would probably be helped from some supportive psychotherapy.

He appears able to manage benefits. Prognosis appears fair to poor.

Sincerely,

John J. Mallet, Ph.D.
Clin./& Neuropsychology

JJM:fbg

II.   **MAKING PERFORMANCE ADJUSTMENTS**

Check the blocks representing the individual's ability to adjust ot a job and complete item #4.

| Ability to understand, remember and carry out | Unlimited | Good | Fair | Poor | None |
|---|---|---|---|---|---|
| 1. Complex job instructions | | | / | | |
| 2. Detailed, but not complex job instructions | | ✓ | | | |
| 3. Simple job instructions | ✓ | | | | |
| 4. Describe any limitations and include the medical/clinical findings that support this assessment: i.e., intellectual ability, thought or organization, memory, comprehension, etc. | | | | | |

As can be seen from his test scores, when he is not
distracted by pain he obtained a Verbal IQ of
89. Performance IQ 97. Full Scale IQ 91; General
Memory 93, Working memory 91. When dis-
tracted by pain, he is helpless.

III.   **MAKING PERSONAL/SOCIAL ADJUSTMENTS**

Check the blocks representing the individual's ability to adjust personally and socially.

| Ability | Unlimited | Good | Fair | Poor | None |
|---|---|---|---|---|---|
| 1. Maintain personal appearance | | ✓ | | | |
| 2. Behave in an emotionally stable manner | | ← → | | | |
| 3. Relate predictable in social situations | | | ✓ | | |
| 4. Demonstrate reliability | | ← → | | | |
| 5. Describe any limitations and include the medical/clinical findings that support this assessment. | | | | | |

This is immaturity emotionally stemming from
loss of his biological father. There is further
emotional damage as a depressive reaction
to his neurological disturbance.
He may direct anger towards
himself.

## MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (MENTAL)

☐ As of patient's last visit (_____)        ☐ As of_____

STRINGER, JIMMY
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              720      1036933
404-794-7945             26       DIB
CDT636A 86    7444    12/01/2003      _____

To determine this individual's ability to do work–related activities on a day-to-day basis in a regular work setting, please give us an assessment – BASED ON YOUR EXAMINATION – of how the individual's mental capabilities are affected by the impairment(s). Consider the medical history, the chronicity of findings (or lack thereof), and the expected duration of any work-related limitations, but not the individual's age, sex or work experience.

For each activity shown below:

(1)    Describe the individual's ability to perform the activity according to the following terms:

| | |
|---|---|
| **Unlimited** | Ability to function in this area is not limited by a mental impairment. |
| **Good** | Ability to function in this area is more than satisfactory. |
| **Fair** | Ability to function in this area is limited but satisfactory. |
| **Poor** | Ability to function in this area is seriously limited but not precluded. |
| **None** | No useful ability to function in this area. |

(2)    Identify the particular medical or clinical findings (I.E. mental status examination, behavior, intelligence test results, and symptoms) which support your assessment of any limitations.

IT IS IMPORTANT THAT YOU RELATE PARTICULAR MEDICAL FINDINGS TO ANY ASSESSED LIMITATION IN CAPACITY. THE USEFULNESS OF YOUR ASSESSMENT DEPENDS ON THE EXTENT TO WHICH YOU DO THIS.

### I.    MAKING OCCUPATIONAL ADJUSTMENTS

Check the blocks representing the individual's ability to adjust to a job and complete item #9.

| Ability | Unlimited | Good | Fair | Poor | None |
|---|---|---|---|---|---|
| 1. Follow work rules | | ✓ | | | |
| 2. Relate to co-workers | | | ✓ | | |
| 3. Deal with the public | | | ✓ | ✓ | |
| 4. Use judgment | | | ✓ | | |
| 5. Interact with supervisors | | | ✓ | | |
| 6. Deal with work stresses | | | | ✓ | |
| 7. Function independently | | | ✓ | | |
| 8. Maintain attention/concentration | | | | ✓ | ✓ |

9. Describe any limitations and include the medical/clinical findings that support this assessment.

This claimant has a neurological Disorder: when he experiences jabs of pain, he is tempo- rarily out of action. He also is experiencing a general slowing apart of his illness.

216 307
4

RADIOLOGY REPORT
GRADY HEALTH SYSTEM
80 Butler Street SE
Atlanta, Georgia 30335-3801

000014560031          3297306
Jimmie T Stringer

                            Time of Exam:     Floor/Clinic:
(Pt. Type: 01 00 00)        16Apr2002 17:24   NEURO

---------------------------------------------------------------

Procedures Requested By: Dr James Bicksel            Id:99114
Attending Physician:     Dr James Bicksel            Id:99114
    MRI, CSPINE WO CONTRAST
    MRI TSPINE WO CONTRAST

Procedures Performed:
    Same as above.

Date Dictated: 17Apr2002      Date Transcribed: 17Apr2002


MRI, CSPINE WO CONTRAST
    History: Shooting pains within the thoracic spine

    Technique: Multi-planar MRI was performed of the cervical and
    thoracic spine

    Findings: Vertebral body heights and marrow signal are
    preserved throughout. Alignment remains anatomic. The spinal
    cord demonstrates normal configuration and signal
    characteristics throughout all imaged levels. Disc spaces are
    normal in appearance throughout the spine with the exception
    of the following levels:

    C3-4: Prominent left disc osteophyte causing moderate neural
    foraminal compromise on the left but minimal effect on the
    spinal canal.

    C4-5, C5-6, C6-7: Minimal dorsal disc osteophyte formation
    with hypertrophy of the joints of Luschka causing mild neural
    foraminal compromise on the left, but no canal compromise.

    T2-3, 3-4 and T9-10 degenerative disc changes with mild
    dorsal disc displacement causing mild effacement of the
    thecal sac at T9-10, and to a lesser degree at T2-3. The cord
    is not affected. Neural foramina are patent at all imaged
    levels.


    IMPRESSION:
    Impression:

    1. Mild-to-moderate chronic cervical and thoracic
    degenerative disc changes as described, most severe at C3-4
    where there is moderate left neuroforaminal compromise.
    2. No evidence of pathology which could account for a
    thoracic radiculopathy.

    This study was personally reviewed by Dr. Paul Carpenter, the
    attending radiologist in this case.

(CONTINUED ON NEXT PAGE)

RADIOLOGY REPORT
GRADY HEALTH SYSTEM
80 Butler Street SE
Atlanta, Georgia 30335-3801

G00014560031          3297306
Jimmie T Stringer

Time of Exam:          Floor/Clinic:

MRI TSPINE WO CONTRAST

Michael B Jones          Paul Carpenter

STRINGER ,JIMMIE                          Radiology
----------------------------------------------------------------------PAGE    1
MRI Spin  01/29/07 15:55    --
MRI C SPINE WO/CON                    01/29/07 03:55PM
FULL REPORT:   MRI, cervical spine.
MRI of cervical spine was performed axial and sagittal T1 and T2.
There is disc space narrowing at C4-5, 5-6, and 6-7 with minimal
bulging posteriorly at these levels as well as C3-4 upon the ventral
subarachnoid space of the cervical canal. No spinal cord abnormality
apparent.
Neural foramina: C2-3 normal, C3-4 minimal narrowing on the right,
C4-5 minimal narrowing bilaterally, C5-6 moderate narrowing, left,
and C7-T1 not visualized on the axial.
IMPRESSION:   Disc degeneration and mild spinal stenosis, as
described.
Interpreted by: Arthur T. Gronner, M.D.
Electronically Signed by: Arthur T. Gronner, M.D.
17BDisc degeneration and mild spinal stenosis, as
described.
Electronically Signed by: Arthur T. Gronner, M.D.

.7BP0745

*Exhibit -F*

Exhibit 3.0 Fcv-05516-SI    Document 23-4    Filed 02/29/2008    Page 28 of 33

```
DATE 09/06/07    PERALTA COMMUNITY COLLEGE DISTRICT ACADEMIC RECORD      PAGE  1
                                                                  ** UNOFFICIAL **
STINGER JIMMIE T       SSN 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    BIRTHDATE 01/19/71    ** TRANSCRIPT **
--------------------------------------------------------------------------------
                                                     ATT       COMP     G.PTS    GPA
DISTRICT SEMESTER TOTALS                             7.50      6.00    12.00   1.60

--------------------------------------------------------------------------------
     CODE DEPT   CRSE   TITLE                 ATT    COMP GRD   G.PTS   INSTRUCTOR

                               FALL    2006
MERRITT
  --0056 PARLG 008   CIVIL PROCEDURE         3.00   0.00 I     0.00   WILLIS L
    0082 PARLG 001   LAW/LEGAL PROFESSION    3.00   0.00 F     0.00   SKOMER J
    0126 LRNRE 272A  COMPUTER ACCESS PROJ    1.50   1.50 CR    0.00   ALEXANDER
    0128 LRNRE 211A  COMPUTER ACCESS         1.50   1.50 A     6.00   ALEXANDER
    0529 PARLG 006   LEGAL RESEARCH          3.00   3.00 C     6.00   WARD L

         CURRENT     SEMESTER TOTALS         7.50   6.00      12.00   GPA 1.60
         CUMULATIVE SEMESTER TOTALS          7.50   6.00      12.00   GPA 1.60


         ************** END OF TRANSCRIPT *************** (A064)
```



# ATLANTA TECHNICAL COLLEGE
## 1560 Metropolitan Parkway, SW
## Atlanta, GA 30309

Phone: 404.225.4400
Fax: 404.225.4445
www.atlantatech.edu

Student No: 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   Date of Birth: 19-JAN-1971

Date Issued: 05-OCT-2004

Page: 1

Record of: Jimmie T. Stringer
1843 Markone Street, NW
Atlanta, GA 30318

Issued To: Jimmie Stringer
1843 Markone Street, NW
Atlanta, GA 30318

Course Level: Credit - Dipl/Cert/Associate
Student Type: Returning Credit Students
High School: GED 01-JUN-2000
First Admit: Spring Quarter 2000
Last Admit: Summer Quarter 2004

Current Program
College : Credit
Major : Paralegal Studies

| SUBJ | NO. | C | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|---|--------------|------|-----|-----|---|

## INSTITUTION CREDIT

**Winter Quarter 2001**
Credit
Automotive Technology
Returning Credit Students

| SUBJ | NO. | C | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|---|--------------|------|-----|-----|---|
| RDG | 097 | 1 | Reading III | 5.00 | U | 0.00 | |

Ehrs: 0.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00
Good Standing

## IN PROGRESS WORK

**Winter Quarter 2001**

| | | | | | | | |
|------|-----|---|--------------|------|-----|-----|---|
| ENG | 097 | 1 | English III | 5.00 | IN PROGRESS | | |
| MAT | 097 | 1 | Math III | 5.00 | IN PROGRESS | | |

In Progress Credits 10.00

**Summer Quarter 2003**
Credit
Paralegal Studies
Returning Credit Students

| | | | | | | | |
|------|-----|---|--------------|------|-----|-----|---|
| MAT | 097 | 1 | Math III | 5.00 | U | 0.00 | |
| PSY | 191 | 1 | Introductory Psychology | 5.00 | B 2 | 15.00 | |
| SCT | 100 | 1 | Introduction to Microcomputers | 3.00 | B 2 | 9.00 | |

Ehrs: 8.00 GPA-Hrs: 8.00 QPts: 24.00 GPA: 3.00
Good Standing

**Fall Quarter 2003**
Credit

**************** CONTINUED ON NEXT COLUMN ****************

| SUBJ | NO. | C | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|---|--------------|------|-----|-----|---|

Institution Information continued:
Paralegal Studies
Returning Credit Students

| | | | | | | | |
|------|-----|---|--------------|------|-----|-----|---|
| ENG | 191 | 1 | Composition and Rhetoric I | 5.00 | W | 0.00 | |
| MAT | 098 | 1 | Pre-Algebra | 5.00 | W | 0.00 | |
| PLS | 101 | 1 | Introduction to Law and Ethics | 5.00 | W | 0.00 | |
| SPC | 191 | 1 | Fundamentals of Speech | 5.00 | W | 0.00 | |

Ehrs: 0.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00
Good Standing

**Winter Quarter 2004**
Credit
Paralegal Studies
Returning Credit Students

| | | | | | | | |
|------|-----|---|--------------|------|-----|-----|---|
| ENG | 191 | 1 | Composition and Rhetoric I | 5.00 | W | 0.00 | |
| MAT | 098 | 1 | Pre-Algebra | 5.00 | W | 0.00 | |
| SPC | 191 | 1 | Fundamentals of Speech | 5.00 | W | 0.00 | |

Ehrs: 0.00 GPA-Hrs: 0.00 QPts: 0.00 GPA: 0.00
Good Standing

## IN PROGRESS WORK

**Fall Quarter 2004**

| | | | | | | | |
|------|-----|---|--------------|------|-----|-----|---|
| MAT | 098 | 1 | Pre-Algebra | 5.00 | IN PROGRESS | | |

In Progress Credits 5.00

**************** TRANSCRIPT TOTALS ****************

| | Earned Hrs | GPA Hrs | Points | GPA |
|---|---|---|---|---|
| TOTAL INSTITUTION | 8.00 | 8.00 | 24.00 | 3.00 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 8.00 | 8.00 | 24.00 | 3.00 |

**************** END OF TRANSCRIPT ****************

*This transcript was given to above named Student in a Sealed envelope.*

AN OFFICIAL SIGNATURE IS WHITE WITH A BLUE BACKGROUND   REJECT DOCUMENT IF SIGNATURE IS ALTERED OR DISTORTED

In accordance with USC 438 (5) (4) (8) (The Family Educational Rights and Privacy Act of 1974) you are hereby notified that this information is provided upon the condition that you, your agent or employees, will not permit any other party access to this record. Alterations of this transcript may be a criminal offense.

This official document is printed on blue SCRIP-SAFE® security paper and does not require a raised seal. The paper is blue in color and a security statement containing the name of the institution appears when photocopied. An official signature is white with a blue background. Reject document as official if the signature is distorted or has been photocopied.

Arlene V. Clarke, Registrar

GRADING LEGEND PRINTED ON REVERSE

# MERRITT COLLEGE
## DISABLED STUDENTS PROGRAM & SERVICES
### COUNSELING APPOINTMENT SLIP

**STUDENT NAME:** _Stingel_ , _Timmy_

Last Name                    First Name

**Recorder** _Timmy Stinger_

NAME

**I have an appointment with:**

_Peggy_

**COUNSELOR**

**DAY** _March_  **DATE** _/_   **TIME** _7:am_  (AM/PM)

The above counseling appointment is being set aside for me.  If I am unable to keep the appointment, I will allow 24 hours to cancel or reschedule by calling DSP&S at 436-2429.

Exhibit-A

02/03/05

Case 3:07-cv-05516-SI   Document 23-4   Filed 02/29/2008   Page 32 of 33
Petition for Appointment of Guardian of Minor - Person

| Role | Party Name | Representation |
|------|-----------|----------------|
| Petitioner | MARTA BROWN | Proper |
| Third Party | Jimmie Stringer | Proper |
| Minor | MARQUIS MCADOO | |
| Minor | SAYVEON TYSON | |
| Minor | JADA STRINGER | |
| Minor | JUANA STRINGER | |

RP05196905

Exhibit - H

Family

Case 3:07-cv-05516-SI    Document 23-4    Filed 02/29/2008    Page 33 of 33

# United States tort law

From Wikipedia, the free encyclopedia

Under **United States tort law**, torts are generally divided into three categories: intentional torts, negligence, and strict liability torts.

## Contents

- 1 Intentional torts
- 2 Negligence
- 3 Strict liability
- 4 Federal torts
- 5 See also

## Intentional torts

Intentional torts include those actions that are intentional and voluntary and that are made with knowledge by the tortfeasor (i.e. the person who committed the tort) upon the plaintiff (the one who brings the complaint seeking relief). Intentional torts include: battery, assault (apprehension of harmful or offensive contact), false imprisonment, intentional infliction of emotional distress (IIED), invasion of privacy, fraud, defamation of character (includes libel, which is written defamation of character and slander, which is non-written defamation of character), malicious prosecution, abuse of process, the real property tort of trespass to land, and the personal property torts of conversion and trespass to chattels.

## Negligence

Amongst unintentional torts one finds negligence as being the most common source of litigation in most American courts. It is a form of extracontractual liability that is based upon a duty of care of a reasonable person, who, being the proximate cause of damages, and but for the tortfeasor's act, is the cause of damages to the plaintiff. Other non-intentional torts include negligent infliction of emotional distress (or NIED, not recognized in all states), malpractice (professional negligence), and product liability (liability of manufacturers, wholesalers and retailers for unreasonably dangerous products).

## Strict liability

Strict liability torts are brought for injuries resulting from ultrahazardous activities, for which the defendant will be held liable even if there was no negligence on his/her part. Strict liability also applies to some types of product liability claims and to copyright infringement.

Most tort claims or causes of action arise under state law and are heard in state courts. Some state tort claims are heard in federal courts under doctrines like diversity of citizenship of the parties or supplemental jurisdiction; such topics are the core of the standard American civil procedure course and are too complex to summarize here. See United States district court for more information.

## Federal torts